PACIFIC NATL. FIRE INS. Co., et al. *v.* DOBY, et al.

April 12, 1954

No. 39196      60 Adv. S. 1      71 So. 2d 449

*Welch, Gibbes & Butts,* Laurel; *Frank Clark,* Waynesboro, for appellants.

*Stanford Young,* Waynesboro, for appellees.

ROBERDS, P. J.

Appellees, father and son, conducted a mercantile business in Waynesboro, Mississippi. They carried water-damage insurance with appellants. On the night of April 5th-6th, 1953, the merchandise was damaged by water. The Insurance Companies denied liability but all parties agreed that if there was liability the amount of the damage was $921.27. The jury found appellants liable and rendered a verdict against them for said amount. Judgment was entered accordingly. The Insurance Companies appeal.

The insurance policies contained this provision: "This company shall not be liable for loss to the interior of the building or the property covered therein caused (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct force of wind or hail and then shall be liable for loss to the interior of the building or

the property covered therein as may be caused by rain, snow, sand or dust entering the building through openings through the roof or walls made by direct action of wind or hail * * *''. Thus it is seen the insurer is not liable unless there is first an actual damage to the roof or walls by direct force of wind or hail through which openings thus made the water causing the damage must pass. Specifically, appellants claim that the cause of the damage was the stoppage of a down drainpipe by a bird nest therein. Appellees claim the wind tore tar paper flashing from the walls of the building and the rain entered through that opening. The case was submitted to the jury on these issues of fact. The jury found for appellees. Appellants say there is no evidence to sustain that verdict, and they should have a peremptory instruction, or, if not, that the verdict is against the great weight of the evidence, and the case should be reversed and remanded for a new trial. Both questions are included within the contention that the testimony is not sufficient to sustain the verdict.

The building, owned by R. E. Cooley, which housed the damaged goods was an old two-story brick building. It was thirty feet wide north and south and ninety feet deep east and west. It faced west. The lower floor was divided by a partition extending east and west. Appellees leased the north side of the lower floor and the goods were in that space when damaged by the water. Apparently the main quantity of the water came down within the north wall.

The walls of the building were brick, and they extended some two or three feet above the roof entirely around the building. The parties call the part of the brick wall above the roof a parapet. At the southeast and northeast corners of the building above the space leased by appellees were outlets for the water which fell upon the roof. These outlets were some twelve to fourteen inches in diameter, extending through the brick parapet. The water passing through these openings

poured into downspouts located outside the building, through which downspouts the water passed to the ground.

The roof consisted of tar paper. It was flat, with a gradual slope from the front to the rear of the building, the total slope being about four feet. The roofing was so placed as to extend up inside the brick walls a distance of some sixteen inches above the flat roof. The witnesses called that flashing.

About five o'clock in the morning of October 6, 1953, the town nightwatchman telephoned appellees that much water was pouring into their leased premises. Appellees quickly came to the building. They said an unusually heavy rain had fallen in Waynesboro that night. It was raining hard when they went to their place of business. They tried to relieve the water situation by sweeping it out of the building and by catching and emptying it out of the building by use of tubs. Nevertheless, the damage occurred. Appellees said that apparently the water was coming down into the building along or near the north wall and more to the eastern than the western end thereof. It is in evidence the rain that night was very heavy and there was a strong wind, so much so that small limbs had blown from trees, one large tree had blown down and at least one plate glass window had blown out.

Appellees testified, in substance, that they examined the roof; that they found the tar paper flashing up the inside of the north brick wall, or parapet, torn or blown loose for several feet; that the tar paper was far enough away from the wall, after being blown, for the water to pour down the space between the flashing paper and the brick wall; that this loose flashing paper was some ten to twelve feet west of the northeast corner of the roof. They testified that the bricks had blown from the tops of two or three chimneys which extended above the roof; that the bricks were yet on the roof; that, from all appearances and indications, the strong winds had blown

this tar paper loose from the brick walls. They said the water was coming into the building beneath where the paper had blown loose. Appellees had occupied this building for some nine months and there had been no leaks in their part thereof during that time, and, during that time, heavy rains had fallen.

Appellees further testified that the corner parapet openings were encased in metal; that this extended outside the brick wall; that outside down drainpipes extended from near these corners to the ground; that the down-pipes were about three inches in diameter, but that the top openings or mouths of the pipes were considerably larger than the pipes themselves; that the metal casements through the parapet openings were so located as to pour the water from the roof into the mouths of the outside drainpipes, but that there was no physical connection between such casements and the down-pipes. In other words, if the down-pipes did not carry the water, it would not be pushed back onto the roof through the parapet openings, but would overflow the mouth, or top, of the down-pipes, and spill down the outside of the drain pipes to the ground.

Mr. Guy Taylor testified there was a strong wind and very heavy rain during the night in question, and that the wind was so strong as to break and blow out a plate glass window at the Motor Company where he worked. That, in substance, was the testimony for the plaintiffs.

For the defendants, Mr. Ernest Overstreet testified that he was the nightwatchman in Waynesboro. He then, and for six or seven years had, roomed upstairs in the south part of the Cooley Building. He said on the night in question "we had a terribly big rain." He also said there was a strong wind but not in storm proportions. He heard about the tree blowing down. He noticed the water flowing into the Doby portion of the building and called them over the telephone. He assisted them in trying to catch the water in tubs and pour and sweep it out of the building. He said that since he had been

rooming in the building "I have known it to leak a little, but nothing to compare with that." In another place he said the rain "was coming down in streams." He said he knew of the existence of the "drain spouts", but he knew nothing of their condition, and he did not know whether the tar paper flashing had blown, or come loose.

Mr. Vesta McLeod testified he was a carpenter; that he works for Mr. Cooley. He went onto the roof to repair it after this damage occurred. The roof is composed of tar paper; the brick parapet extends entirely around the building, and the flashing extended some ten or twelve inches up inside the brick walls; that the top of the flashing "is put in the brick when they was laid there." He said the corner outlets were about twelve inches in diameter and encased with tin. He said the outside drain-pipes were three to four inches in diameter with a funnel shaped top of about twelve inches in diameter and the parapet outlets were supposed to drain into the downspouts. He found a bird's nest in the northeast drainpipe and used a ten-foot pole to push it out. He concluded that was the trouble. He said, in his opinion, the existence of this nest would have backed up the water "a little." "It would have backed up on the roof, and from it probably poured on the side of it." He refused to say whether he thought the water "would have backed under the flashing." He again gave it as his opinion that the water "would have backed up some" as a result of a hard rain and the existence of the nest in the pipe. He was asked how the water got into the building and replied "well, that is something I couldn't say for sure." He then refused to say what caused the water to enter the building. He said he did not notice the flashing was loose but he did not examine it.

M. W. Lomax testified that he had charge of the Cooley Building. About 6:30 of the morning of April 6th he received notice of the flooding of the Doby part of it. He got McLeod to go there for the purpose of making needed repairs. He said the water came from

the vicinity of the northeast corner of the building; that he did not know how it got into the building or what caused it to do so. He thought the amount of water coming into the building indicated that much water had accumulated on the roof. The ceiling area through which the water came was twenty-two feet. He didn't know whether the wind damaged the roof.

Mr. Nelson Webb testified. He was the insurance adjuster. Griffith, the local agent, called him at Laurel about 8:30 in the morning and he got to Waynesboro about ten o'clock. He inspected the damage to the Doby merchandise, and they agreed, as above stated, upon the amount the insurers were to pay in case of liability. However, after he learned McLeod had found the bird nest in the northeast down-pipe he informed the Dobys the policies did not cover the loss. He went onto the roof. He explained about the brick parapet, the flat tar roof, etc. He found some silt on the roof. He said the southeast drainpipe was clean. He estimated the brick parapet to be four and one-half to five feet above the roof. There was no water on the roof when he examined it. He described the outside down-pipe and the opening and the corner openings through the parapet brick wall about as the other witnesses had done. He said the flashing appeared to be intact. "I didn't pull it up to see in that particular place now." When asked to give his opinion as to how the water got into the room below he said "It is my judgment that from this distance here across to there, the water rose to a point to where it run down under the tar paper flashing, down the side of the wall, because my inspection of the room immediately beneath that indicated that, the water, the gray streaks, where it ran right down the wall in the corner." He was asked if he inspected the tar paper flashing around the brick wall in the area where it appeared the water went through and he replied "Not to the extent of lifting the metal flashing that covered it completely out; no, sir, I did not."

That was the proof on behalf of the defendants.

Mr. Kenneth Doby was recalled in rebuttal by the plaintiffs. As bearing upon the proximity of the outer end of the metal encasement through the parapet outlets and the mouth of the down-drainpipe on the outside of the building he said you could stand fifteen feet from the building and see through the parapet openings.

From the foregoing, it is readily seen that the jury could have, and presumably did, consider these, among other possible, factors in reaching their verdict:

First, there was an unusually heavy rain and a hard wind. Bricks had blown off the tops of the chimneys at this building.

Second, there was a conflict as to whether the flashing had become loose. The Dobys testified positively it was loose for several feet in the vicinity where the water ran through the roof. The testimony of McLeod and Webb presented a factual issue on that, although their testimony conveys the impression they were not willing to make a positive statement about it.

Third, the jury, as reasonable men, could well have accepted as a fact that there was a serious defect some place in the roof. It is undisputed the water came from the roof into the rooms below in great volume. Had there been no defect through which it flowed then, for the overflow to take place, it was necessary for the water to accumulate on the roof to a depth of two or three feet, or four and a half feet, according to Mr. Webb, before it would have spilled over the brick parapet walls, and had it done that, the water would have run down outside, not inside, the walls. Had the water flowed down outside the walls it would not have damaged the merchandise, in the manner here shown, located inside the building below. Now, no one claims that there was a defect in the flat part of the roof, so the water either poured between the flashing and the wall or it ran over the walls, and, if the latter, the water, as stated, would have gone down outside, and not inside, the walls.

Fourth, the Dobys said there was no physical connection between the parapet openings and the mouth of the down-pipe. This means that even though the down-pipe was stopped up with a bird's nest the water would not have backed upon this slanting roof but would have spilled, or run down the outside of the pipe, to the ground.

Fifth, the Dobys had occupied this building for nine months. During that time there had been heavy rains and the roof above their premises had not leaked during said nine months.

Other conceivable factors might have been considered by the jury but ▮▮ ▮ we think sufficient has been stated to justify submission to the jury the question whether the wind loosened the flashing and the water descended between it and the brick walls, which was the theory of plaintiffs.

Affirmed.

*Hall, Lee, Holmes* and *Ethridge, JJ.,* concur.